# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KEVIN CARROZZA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 17-12368-FDS |
| ) | |
| CVS PHARMACY, INC., d/b/a ) | |
| CVS PHARMACY, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO PRECLUDE AND MOTION FOR SUMMARY JUDGMENT, AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, <u>MOTION TO TAKE DEPOSITION, AND MOTION TO STRIKE</u>

**SAYLOR, J.**

This is a lawsuit against a pharmacy, arising out of injuries allegedly sustained after ingesting an antibiotic. Jurisdiction is based on diversity of citizenship.

Plaintiff Kevin Carrozza was prescribed levofloxacin (Levaquin), a quinolone antibiotic. Carrozza had the prescription filled at a CVS Pharmacy in Bridgewater, Massachusetts. The internal patient database at CVS included a "hardstop" warning stating that Carrozza was allergic to quinolones. The pharmacist on duty then investigated further, and found notes stating that Carrozza previously denied having a quinolone allergy and had been prescribed quinolone on multiple prior occasions. The pharmacist ultimately decided to dispense the drug. Carrozza alleges that he had an allergic reaction to the drug, and alleges that it caused him to suffer

swollen and disfigured skin, along with Stevens-Johnson Syndrome ("SJS").[1] Carrozza filed suit against CVS, alleging negligence, violation of Mass. Gen. Laws ch. 93A, and breach of implied warranty.

CVS has moved to preclude the testimony of Carrozza's sole expert witness, Dr. Kenneth Backman, and for summary judgment. Carrozza has cross-moved for partial summary judgment. He has also moved to take an additional deposition after close of discovery and to strike certain statements made at the May 16, 2019 motion hearing. For the following reasons, CVS's motions to preclude and for summary judgment will be granted; Carrozza's motions for partial summary judgment and to take an additional deposition will be denied; and Carrozza's motion to strike will be denied as moot.

## I.  Background

### A.  Factual Background

The following facts are as set forth in the record.

Carrozza is a citizen of Massachusetts. CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island. (ECF No. 1 ¶ 7).

On April 22, 2015, Carrozza went to fill a prescription for Levaquin, a quinolone antibiotic, at a CVS pharmacy in Bridgewater, Massachusetts. (Am. Compl. ¶ 5). He was prescribed the drug by his physician, Dr. George Despines, for a head cold. (Am. Compl. Ex.

---

[1] SJS is a "serious skin disorder," which if treated properly, "can be eliminated within a few days of hospitalization, but severe cases may last several months." *Houston v. United States*, 638 F. App'x 508, 510 n.1 (7th Cir. 2016) (citation omitted) (unreported). "SJS typically starts with flu or fever-like symptoms, and after a few days the skin begins to peel or blister, causing painful raw areas known as erosions that resemble severe hot water burns. . . . For most people SJS damages the mucous membranes, including the lining of the mouth and airways, making it difficult to breathe and swallow. . . . SJS often affects eyes, as well, causing redness in the mucous membranes that protect the white parts of the eye, and damaging the cornea." *Id.* (citations omitted).

A).[2]  Dr. Despines's medical records as of that date did not state that Carrozza was allergic to Levaquin or other quinolones. (ECF No. 62, Ex. 1).[3]  Carrozza later testified that he was unaware at that time that he had a quinolone allergy. (ECF No. 62, Ex. 2 ("Carrozza Dep.") at 64:8-14).

The CVS computer system contained a "hardstop" warning that Carrozza was allergic to quinolones. (ECF No. 70 at 17).[4]  The pharmacist on duty, Richard Wokoske, investigated further using the computer system and Carrozza's patient profile and discovered conflicting information. (Ivanoski Dep. at 76:16-24). For example, a CVS Patient Profile note dated September 2, 2009, reads "[Carrozza] states he has no quinolone allergy." (ECF No. 62, Ex. 4). Similarly, the internal records of CVS showed that it had previously filled quinolone prescriptions for Carrozza on February 26, 2008 (Levaquin), September 2, 2009 (Avelox), and January 26, 2010 (Avelox). (ECF No. 62, Ex. 5). Under such circumstances, under CVS policy the decision whether to fill a prescription falls to the dispensing pharmacist. (Ivanoski Dep. at 76:22-24). Wokoske decided to dispense the Levaquin.

Carrozza then took the medication. After taking one dose, Carrozza suffered what was later diagnosed as an allergic reaction and sought treatment at Morton Hospital in Taunton,

---

[2] If in fact Carrozza had a cold, rather than a bacterial infection, antibiotics would not have any effect, either curative or palliative. *See* [cite from CDC]

[3] Dr. Despines's notes as of May 15, 2015, only stated that Carrozza was allergic to "Tetracycline HCl" and "sulfa." (*Id.*).

[4] According to Wokoske, a "hardstop" warning requires a pharmacist to conduct "more research on the patient." (Wokoske Dep. at 53:10-12). By contrast, a "softstop" warning suggests that the information in question "may have been checked before" and that the pharmacist may "be able to go by it." (*Id.* at 53:13-16). Hardstop warnings are stronger than softstop warnings. (*Id.* at 53:17-19).

The three softstop warnings in Carrozza's file were as follows: (1) a warning about Levaquin's potential interaction with another drug, Escitalopram, (ECF No. 70 at 19); (2) a warning that Levaquin should be used cautiously when "Myocardial Ischemia exists," (*id.* at 20); and (3) a warning that "[t]he concurrent use of multiple agents that prolong the QTc interval may result in potentially life-threatening cardiac arrhythmias," (*id.* at 21). None of the softstop warnings are at issue here.

Massachusetts. Medical records from Morton Hospital show that he suffered a "red circular rash with central blisters - atypical appearance for allergic reaction but may represent erythema multiforme/very mild SJS." (ECF No. 62, Ex. 6). There appear to have been two rashes: one on his left arm, and one on his right ankle. (*Id.*).

Carrozza filed this suit in 2017. On October 8, 2018, he filed a disclosure identifying one expert witness, Dr. Kenneth Backman, an allergist and immunologist. (ECF No. 48). In an affidavit executed on September 28, 2018, Dr. Backman attested that Wokoske's dispensing of Levaquin despite the hardstop warning "was a breach of standard of care." (ECF No. 64 Ex. 2). He further attested "[w]hile the onset of symptoms following ingestion of Levaquin was rapid for Stevens-Johnson Syndrome, SJS can occur rapidly in patients who have experienced reactions to that medication previously." (*Id.*). He concluded that "Levaquin is the likely cause of [ocular injury] and other damages that Mr. Carrozza experienced." (*Id.*).

On February 15, 2019, counsel for CVS deposed Dr. Backman. He testified, contrary to his earlier sworn statement, that he did not know "the standard of care [that is] applicable to a pharmacist in this situation." (ECF No. 64 Ex. 3 ("Backman Dep.") at 94:14-18). He further testified that he did not know how Carrozza's rashes appeared (*id.* at 98:20-22) and whether he had any other symptoms of SJS, including mucosal involvement, epidermal detachment, skin sloughing, target lesions, and a fever (*id.* at 99:4-101:4). Ultimately, Dr. Backman conceded that he did not have sufficient information to form an opinion as to whether Carrozza had SJS. (*Id.* at 100:2-8). Moreover, he stated that no physician at Morton Hospital had diagnosed SJS. (*Id.* at 133:19-24). The only basis for Dr. Backman's belief that Carrozza had SJS was an opinion offered by an ophthalmologist, Dr. Stephen Foster. (*Id.* at 100:9-13). However, because Carrozza's counsel had failed to comply with the requirements of the Federal Rules of Civil

Procedure governing expert disclosures, the Court had previously denied his motion to admit Dr. Foster's affidavit, which was substantively an expert report. (ECF Nos. 44, 51).[5]

Dr. Backman's testimony revealed that he had a limited understanding of the facts of this case and SJS generally. For example, the only source of information concerning SJS he reviewed for this matter was a medical information program called UpToDate. (Backman Dep. at 12:5-21). He was unable to identify the criteria used to diagnose SJS, and has neither diagnosed nor treated any patients with SJS. (*Id.* at 63:8-12; 68:9-23). He never communicated with Carrozza's medical providers (*id.* at 15:6-9) and reviewed no medical records other than documents from Morton Hospital and two or three days' worth of notes from Dr. Despines (*id.* at 15:11-19:2). He did not review photographs taken at Morton Hospital of Carrozza's rashes. (*Id.* at 22:15-18). Dr. Backman did not review the deposition testimony of Carrozza or CVS personnel. (*Id.* at 19:4-20:12). He did not know that Carrozza had been prescribed quinolone on multiple occasions prior to April 22, 2015, (*id.* at 71:13-19), and that Carrozza himself purportedly was unaware of a quinolone allergy before that date (*id.* at 70:17-20). And, he was unaware of the responsibilities of a CVS pharmacist and the standard of care required of pharmacists who encounter hardstop and softstop warnings. (*Id.* at 85:14-19; 87:5-11).

CVS has presented three expert reports concerning the issues of standard of care and causation. As relevant here, Melissa Mattison, a pharmacist and Clinical Associate Professor of Pharmacy Practice, has attested that Wokoske acted in accordance with the appropriate standard of care and that Carrozza did not suffer from SJS. (ECF No. 62, Ex. 9). Dr. Daniela Kroshinsky, the Director of Inpatient Dermatology at Massachusetts General Hospital, has attested that

---

[5] Carrozza later moved to admit Dr. Foster's affidavit under Fed. R. Evid. 803(4)&(6). (ECF No. 58). However, because he again failed to comply with the Federal Rules of Civil Procedure governing expert disclosures, his motion was denied. (ECF No. 61).

Carrozza did not have SJS and that he instead suffered "a limited cutaneous skin reaction." (ECF No. 62, Ex. 10). Dr. George Frangieh, an Assistant Surgeon of Ophthalmology at Massachusetts Eye & Ear Infirmary, attested that Carrozza did not have the ocular problems associated with SJS. (ECF No. 62, Ex. 11).

### B.  Procedural Background

On May 1, 2015, Carrozza sent CVS a purported Chapter 93A demand letter seeking $650,000 in damages. (Am. Compl. Ex. A). CVS sent a response on July 8, 2015, challenging the demand letter as improper under Chapter 93A because it "fail[ed] to reference the date of the alleged incident" and "fail[ed] to identify any cognizable unfair or deceptive act or practice." (Am. Compl. Ex. B). CVS also disclaimed liability, contending that Dr. Despines was at fault for prescribing the medication and that Carrozza's failure to advise Wokoske of the allergy exceeded any negligence by CVS. (*Id.*).

The complaint in this action was filed in Brockton District Court on October 13, 2017. CVS removed the case to this court based on diversity jurisdiction on December 1, 2017. The complaint asserts three claims. Count One asserts a claim for "tort," which the Court will construe to be a claim for negligence. (Am. Compl. ¶¶ 4-17). Count Two asserts a claim under Mass. Gen. Laws ch. 93A. (*Id.* ¶¶ 18-25). Count Three asserts a claim for product liability, which is in substance a claim for breach of implied warranty. (*Id.* ¶¶ 26-32).

CVS has moved to preclude the testimony of Dr. Backman under Fed. R. Evid. 702 and *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993). After completion of discovery, CVS moved for summary judgment, and Carrozza cross-moved for partial summary judgment.[6]

---

[6] Carrozza's supporting memorandum is unclear as to the claims on which he is seeking partial summary judgment. However, he appears to suggest that CVS failed to warn him about the dangers of Levaquin.

Carrozza further moved to depose Dr. Foster, whose affidavit the Court previously excluded, and to strike certain statements made by defense counsel at the May 16, 2019 motion hearing.

## II.     Motion to Preclude

Fed. R. Evid. 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The adoption of Rule 702 in its present form codified the standard of admissibility for expert testimony that was set forth in *Daubert*. *See United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002).

Under Rule 702, district courts considering the admissibility of scientific testimony must "act as gatekeepers, ensuring that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012) (quoting *Daubert*, 509 U.S. at 597). That gatekeeping function requires that a court consider three sets of issues:  (1) whether the proposed expert is qualified by "knowledge, skill, experience, training, or education"; (2) whether the subject matter of the proposed testimony properly concerns "scientific, technical, or other specialized knowledge"; and (3) "whether the testimony [will be] helpful to the trier of fact, i.e., whether it rests on a reliable foundation and is relevant to the facts of the case." *Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir. 1997) (quoting Fed. R. Evid. 702) (internal quotation marks omitted).

The requirement that an expert's testimony must be based on a reliable scientific

foundation is often the "central focus of a *Daubert* inquiry." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). In *Daubert*, the Supreme Court enumerated a non-exhaustive list of factors that a court may consider in undertaking its reliability analysis: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known rate of error; (4) whether there are standards controlling its application or operation; and (5) whether it is generally accepted in the relevant scientific community. 509 U.S. at 593-94; *see also Samaan*, 670 F.3d at 31-32.

Rule 702 further requires the court to examine whether those methods have been reliably applied. In other words, the court must "ensure that there is an adequate fit between the expert's methods and his conclusions." *Samaan*, 670 F.3d at 32 (citing *Daubert*, 509 U.S. at 591). In evaluating whether expert testimony will be helpful to the trier of fact, the court must determine whether it is relevant, "not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche*, 161 F.3d at 81 (citations omitted); *see also Cipollone v. Yale Indus. Prods., Inc.*, 202 F.3d 376, 380 (1st Cir. 2000) ("The ultimate purpose of the *Daubert* inquiry is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue.").

The focus of the Rule 702 inquiry is on the principles and methodology employed by the expert, not the ultimate conclusions. *Daubert*, 509 U.S. at 595. The court may not subvert the role of the fact-finder in assessing credibility or in weighing conflicting expert opinions. Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible

evidence." *Id.* at 596; *see also Ruiz-Troche*, 161 F.3d at 85 (admitting testimony notwithstanding a lack of peer-reviewed publications because the opinion rested upon good grounds generally and should be tested by the "adversary process").

It is manifestly clear that Dr. Backman is not qualified to offer an expert opinion on either the appropriate standard of care for a pharmacist or whether Carrozza's consumption of Levaquin caused his injuries, particularly the alleged SJS. As noted, Dr. Backman testified that he could not testify as to whether Wokoske complied with the appropriate standard of care in this case. (Backman Dep. at 94:2-96:19). While he had reviewed some literature on SJS before his deposition, his knowledge of that disorder was minimal and the sole basis for his belief that Carrozza had suffered SJS as a result of consuming Levaquin was Dr. Foster's report. (*Id.* at 100:2-13). Dr. Backman further admitted that he was unaware of how Carrozza's injuries, including his rashes and pain, came about (*id.* at 98:20-99:6), or whether he had other symptoms of SJS (*id.* at 99:7-100:23). Indeed, Dr. Backman stated he was unaware of the bases for Dr. Foster's opinion and could not independently corroborate it. (*Id.* at 105:3-111:1). And he was unable to conclude whether Carrozza's injuries were caused by anything other than Levaquin. (*Id.* at 152:25-153:4).

In his opposition, Carrozza raises two arguments, neither of which is persuasive. First, he cites to *Cottam v. CVS Pharmacy*, 436 Mass. 316, 326 (2002), in which the Supreme Judicial Court held that a plaintiff injured by an allergic reaction to a prescription drug did not need to proffer expert testimony in a duty to warn case. (Pl. Mem. in Opp. to Mot. to Preclude at 6). However, the core issue in that case was "the adequacy of the warning, not the technical performance of the pharmacist." 436 Mass. at 326. By contrast, here Carrozza's claims are predicated on the assumption that Wokoske improperly dispensed Levaquin despite the hardstop

warning. That is fundamentally a question about the "technical performance of the pharmacist." *Id.* Furthermore, there is no claim in the complaint for breach of duty to warn.

Second, Carrozza contends that the fact that the Court has precluded admission of Dr. Foster's affidavit does not bar Dr. Backman from relying on it in formulating his own opinion. (Pl. Mem. in Opp. to Mot. to Preclude at 7). In support, he cites *Dep't of Youth Servs. v. A Juvenile*, 398 Mass. 516, 531 (1986), in which the SJC, relying on Fed. R. Evid. 703, stated that courts should "permit[] an expert to base an opinion on facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion." That general proposition is certainly true: experts may rely on otherwise inadmissible evidence in formulating their own opinions, provided the evidence is "of a type reasonably relied upon by experts in the particular field." *See, e.g.*, *Monsanto Co. v. David*, 516 F.3d 1009, 1015-16 (Fed. Cir. 2008); Fed. R. Evid. 703. A witness who has no relevant expertise or familiarity with a subject matter may not, however, simply parrot the conclusions of an expert who does. At a minimum, to allow such testimony would effectively permit a party to evade the disclosure requirements of Rule 26 and would preclude meaningful cross-examination.

Here, Dr. Backman conceded that he had almost no understanding of the facts of this case and could not conclude that Carrozza's ingestion of Levaquin resulted in his injuries, including SJS. It should be obvious that Dr. Backman cannot be permitted to testify that Carrozza was afflicted with SJS, regardless of Dr. Foster's opinion.

In summary, Dr. Backman is not qualified to render the opinions at issue, and his opinions are not based on adequate data. His conclusions therefore amount to mere "assumptions, speculation[,] and guesswork," and his testimony must be excluded under Rule

702. *Polaino v. Bayer Corp.*, 122 F. Supp. 2d 63, 69 (D. Mass. 2000). The motion to preclude his testimony will therefore be granted.

### III. Motions for Summary Judgment

#### A. Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

#### B. Analysis

##### 1. Count One—Negligence

To prevail on a negligence claim, a plaintiff must prove by a preponderance of the evidence "(1) a legal duty owed to the plaintiff by the defendant; (2) a breach of that duty by the

11

defendant; (3) causation; and (4) actual loss by the plaintiff." *Delaney v. Reynolds*, 63 Mass. App. Ct. 239, 241 (2005). In Massachusetts, "where questions of medical or professional judgment are involved, expert opinion is required to show that the defendant acted improperly." *Polonsky v. Union Hosp.*, 11 Mass. App. Ct. 622, 624 (1981). Although no Massachusetts court has expressly stated that expert testimony is required to establish the standard of care for a pharmacist, other courts have so held. *See, e.g.*, *Kovaly v. Wal-Mart Stores Texas, LLC*, 627 F. App'x 288, 289 & n.2 (5th Cir. 2015) (unreported) (stating that Texas law requires expert testimony on the standard of care for pharmacists); *cf. also Montany v. Univ. of New England*, 858 F.3d 34, 38 (1st Cir. 2017) (applying Maine law in holding that expert testimony is required to establish the standard of care absent a showing that the "negligence and harmful results are sufficiently obvious as to lie within common knowledge" (internal quotation marks and citation omitted)). If Dr. Backman's testimony is excluded, Carrozza has no other expert opinion as to the appropriate standard of care.

Carrozza nevertheless contends that no expert testimony on this issue is required. He appears to reason that the hardstop warning constituted a sufficient warning that no reasonable pharmacist would have dispensed the Levaquin. (Pl. Mem. in Supp. of Mot. for Partial SJ at 6). He argues that "the determination [to dispense] did not involve professional or technical knowledge for which a jury need[s] expert aid. Rather, it involved a commonsense determination." (*Id.* at 7). However, that misconstrues the central issue underlying the negligence claim—whether it was a breach of duty for Wokoske to dispense Levaquin despite the hardstop warning. Carrozza has put forth no evidence of any kind that a hardstop warning absolutely bars a pharmacist from dispensing prescribed medication. Indeed, the only evidence in the record concerning hardstop warnings is that they require pharmacists to investigate further.

(Wokoske Dep. at 53:10-12). Here, Wokoske saw that Carrozza had previously denied having a quinolone allergy and was provided quinolone on multiple prior occasions, and ultimately decided to dispense the medication. Whether it was unreasonable for Wokoske to have done so under the circumstances is a matter for expert testimony, not simply the common sense of lay jurors.

Furthermore, and in any event, in Massachusetts expert testimony is required "on highly technical medical issues," including "injury causation." *Lally v. Volkswagen Aktiengesellschaft*, 45 Mass. App. Ct. 317, 325 (1998). Therefore, without Dr. Backman's testimony, Carrozza cannot prove that the drug caused his injuries, or even that he suffered the injuries he alleges.

In short, in the absence of any expert testimony as to breach of duty or causation, summary judgment will be granted to CVS on the negligence claim.[7]

### 2. Count Three—Product Liability

Before turning to the Chapter 93A claim, the Court will first address the product liability claim. Carrozza's product liability argument is so thinly briefed and difficult to comprehend that there is a strong argument for waiver. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Nevertheless, the Court will attempt to address the merits of this claim.

As a preliminary matter, it appears that Carrozza advanced a strict liability theory of recovery in his amended complaint. He first cited *Everett v. Bucky Warren, Inc.*, 376 Mass. 280

---

[7] Carrozza cites to testimony in Dr. Backman's deposition in which he testified that Wokoske breached an applicable standard of care in filling Carrozza's Levaquin prescription. (Backman Dep. at 147:20-148:15). He appears to contend that this testimony precludes summary judgment on the negligence claim. (Pl. Mem. in Opp. to Mot. to Preclude at 8). But, as explained earlier, Dr. Backman also testified that he was not qualified to state whether Wokoske's conduct met the applicable standard of care. (Backman Dep. at 94:2-96:19). Therefore, this additional argument Carrozza advances is unavailing.

13

(1978) for the proposition that "[CVS] is liable for the distribution of an unreasonable dangerous product to Plaintiff." (Am. Compl. ¶ 28). He then cited *Back v. Wickes Corp.*, 375 Mass. 633 (1978) for the proposition that the Levaquin "was unfit and unreasonably dangerous to sell or induce consumption by Plaintiff." (*Id.* ¶ 30).

However, "[i]n Massachusetts, 'there is no strict liability in tort apart from liability for breach of warranty under the Uniform Commercial Code.'" *Cruickshank v. Clean Seas Co.*, 346 B.R. 571, 577 (D. Mass. 2006) (quoting *Guzman v. MRM/Elgin*, 409 Mass. 563, 569 (1991)). Therefore, the Court will construe Carrozza's product liability claim to be a breach of implied warranty claim under the UCC.

Where a plaintiff brings a product liability action premised on a breach of the implied warranties of merchantability or fitness for a particular purpose, he must show that "[the] defendant manufactured or sold the product that injured [him]." *Fireman's Fund Ins. Co. v. Bradford–White Corp.*, 2014 WL 1515266, at *7 (D. Mass. Apr. 15, 2014) (implied warranty of merchantability); *see also Garcia v. Kusan, Inc.*, 39 Mass. App. Ct. 322, 329 (1995) (plaintiff must "establish that some item traced to a specific defendant caused his injury" in order to recover on claims of negligence or breach of implied warranties); Mass. Gen. Laws ch. 106 § 2-315 (implied warranty of fitness for a particular purpose created by a "seller" of the goods). It is undisputed that CVS sold the Levaquin to Carrozza.

However, the UCC applies only to contracts for the sale of goods. *See White v. Peabody Constr. Co., Inc.*, 386 Mass. 121, 132 (1982). Pharmacists do not simply sell medications; they also provide professional healthcare services. *See, e.g.*, *In re Yasmin and Yaz (Drospirenone) Mktg., Sales Practices and Prods. Liab. Litig.*, 692 F. Supp. 2d 1012, 1021 (S.D. Ill. 2010). As the California Supreme Court aptly summarized:

> It is pure hyperbole to suggest, as does plaintiff, that the role of the pharmacist is similar to that of a clerk in an ordinary retail store. With a few exceptions, only a licensed pharmacist may dispense prescription drugs, and as indicated above there are stringent educational and professional requirements for obtaining and retaining a license.
>
> . . .
>
> A key factor is that the pharmacist who fills a prescription is in a different position from the ordinary retailer because he cannot offer a prescription for sale except by order of the doctor. In this respect, he is providing a service to the doctor and acting as an extension of the doctor in the same sense as a technician who takes an X-ray or analyzes a blood sample on a doctor's order.

*Murphy v. E.R. Squibb & Sons, Inc.*, 710 P.2d 247, 251 (Cal. 1985). A pharmacist's dispensing of prescription drugs is more akin to a mixed contract of goods and services rather than a simple sale of goods.

Where, as is here, the underlying sequence of events gives rise to a mixed contract claim, the court must determine whether the contract is predominately one for goods or services. "The test is whether the predominant factor, thrust, or purpose of the contract is (1) the rendition of service, with goods incidentally involved, or is instead (2) a transaction of sale, with labor incidentally involved." *Cumberland Farms, Inc. v. Drehmann Paving & Flooring Co.*, 25 Mass. App. Ct. 530, 534 (1988) (alterations, internal quotation marks, and citations omitted). If the predominant purpose of the transaction was the "rendition of service," then the UCC does not provide a remedy. *See id.* at 535; *White*, 386 Mass. at 132 ("Contracts whose predominant factor, thrust, or purpose is the rendition of services are not within the scope of [the UCC].").

It is undisputable that Wokoske's dispensing of Levaquin was primarily a "rendition of service" immune from the UCC's liability scheme. The Levaquin was prescribed by Dr. Despines; Wokoske had discretion in deciding to ultimately fill the prescription after seeing the hardstop warning, but no input into the suitability of the drug. *Cf. In re Rezulin Prods. Liab.*

*Litig.*, 133 F. Supp. 2d 272, 292 (S.D.N.Y. 2001) (stating "[a] pharmacist's sales of prescription drugs are not attributable to his or her marketing the properties of the drugs" in holding that plaintiffs had no product liability claims against sales representatives under Mississippi law); *cf. also Madison v. Am. Home Prods. Corp.*, 595 S.E.2d 493, 494-96 (S.C. 2004) (holding that when filling prescriptions, pharmacies provide services rather than sell products, such that they may not be held strictly liable); *Herzog v. Arthrocare Corp.*, 2003 WL 1785795, at *13 (D. Me. Mar. 21, 2003) (noting that "case law generally immunizes pharmacists from strict liability because they are not the kind of 'retailers' that strict liability regimes are designed to target"). This view is supported by the Massachusetts Code of Regulations, which frame the pharmacist's role principally in terms of the provision of services. *See* 105 C.M.R. 722.000 *et seq.* (setting forth dispensing procedures for pharmacists); 247 C.M.R. 2.00 (defining dispensing of pharmaceuticals as "the physical act of delivering a drug . . . to an ultimate user pursuant to the lawful order of a practitioner."); 247 C.M.R. 9.01 (requiring pharmacists to verify prescriptions, properly label drugs, secure medications, and maintain patient records and confidentiality, among other things). Accordingly, summary judgment will be granted to CVS on the product liability claim.

In his opposition memorandum, Carrozza raises a number of disjointed arguments, many of which are poorly developed or irrelevant. (*See, e.g.*, Pl. Opp. to Def. Mot. for SJ at 4-6 (again disputing the Court's ruling excluding Dr. Foster's affidavit and criticizing defense counsel's citing to out-of-state authorities). To the extent his arguments are on point, they are unpersuasive.

First, Carrozza contends that "CVS knew [that the Levaquin] was defective, or at least had evidence that [the] product was defective for Mr. Carrozza and failed to warn." (*Id.* at 3).

But nowhere in the amended complaint did Carrozza allege, or even suggest, that this was a failure-to-warn case. A litigant may not posit a theory for the first time in opposition to a summary judgment motion, so this argument must be rejected. *See Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 589 (1st Cir. 2007). And to the extent that the product-liability claim is predicated on a defective-design theory, it would still fail, because "a plaintiff's failure to support [his] claims of a design defect with expert testimony is almost always fatal," and Carrozza has not identified any reason to avoid application of that rule. *Haughton v. Hill Labs., Inc.*, 2007 WL 2484889, at *3 (D. Mass. Aug. 30, 2017) (citing *Morrell v. Precise Eng'g, Inc.*, 36 Mass. App. Ct. 935, 936 (1994)).

Next, he contends that the Levaquin was defective because a consumer like him would have expected not to suffer an allergic reaction from consuming the drug. (Pl. Opp. to Def. Mot. for SJ at 4). In support, he cites *Back*, in which the SJC reversed a jury's verdict in favor of the defendant as to certain warranty claims. 375 Mass. at 643-44. In doing so, the SJC observed that it may be a breach of the implied warranty of fitness if a product does not function as a reasonable consumer would expect in a foreseeable situation. *Id.* at 640. However, that principle is inapplicable here; again, the UCC does not apply to the filling of a prescription by a pharmacist.

### 3. Count Two—Chapter 93A

Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). Conduct is unfair or deceptive if it falls "within any recognized or established common law or statutory concept of unfairness." *VMark Software v. EMC Corp.*, 37 Mass. App. Ct. 610, 620 (1994).

Carrozza has identified no basis for a Chapter 93A claim other than the negligence and

product-liability claims rejected above.[8]  Therefore, summary judgment will be granted to CVS on this claim as well.  *See Kearney v. Philip Morris, Inc.*, 916 F. Supp. 61, 65 (D. Mass. 1996) ("[I]f plaintiff's claims of breach of warranty and negligence fail, plaintiff's [Chapter] 93A claim also fails.").

## IV.     Motion to Take Deposition

In an attempt to avoid summary judgment, Carrozza has also moved to conduct an audio-visual deposition of Dr. Foster to be played at trial.  He contends that "this expert testimony . . . is now needed" because CVS has proffered three expert witnesses.  (Pl. Mem. in Supp. of Mot. to Take Deposition at 3).  He further blames Dr. Backman for "attitude" and "his lack of preparation" in giving deposition testimony.  (*Id.*).

This is clearly an improper attempt to reopen discovery.  It is true that Rule 56, which governs summary judgment, provides that a court may "allow time to obtain affidavits or declarations or to take discovery" if "a nonmovant shows . . . it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d)(2).[9]  However, the deadline for fact discovery was August 31, 2018, and the deadline for plaintiff to designate any experts was October 8, 2018. The Court later extended the deadline for completing expert depositions to February 18, 2019. The motion to depose Dr. Foster was not filed until April 30, 2019.  Carrozza's counsel never properly designated Dr. Foster as an expert witness, failed to depose him as a fact witness, and has failed to show good cause why discovery should be reopened at this stage of proceedings. According, the motion to take Dr. Foster's deposition will be denied.

---

[8] Carrozza contends that there was a Chapter 93A violation because CVS "fail[ed] to notify" him and Dr. Despines about the dangers of Levaquin. (Pl. Opp. to Def. Mot. for SJ at 7).  However, this is simply a reframing of the failure-to-warn theory that he introduced for the first time on summary judgment.

[9] Of course, Carrozza also moved for partial summary judgment.  However, even if Carrozza was a nonmovant, that would not affect the disposition of this motion.

## V.     Motion to Strike

Finally, Carrozza has moved to strike certain statements made by defense counsel at the May 16, 2019 motion hearing. As the Court has not relied on those statements in addressing the other outstanding motions, the motion to strike will be denied as moot.

## VI.    Conclusion

For the foregoing reasons, defendant's motion to preclude and motion for summary judgment are GRANTED. Plaintiff's motion for partial summary judgment and motion to take Dr. Foster's deposition are DENIED. Plaintiff's motion to strike is DENIED as moot.

**So Ordered.**

Dated: July 8, 2019

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge